# IN RE: THE MARRIAGE OF TILTON
## Case No. 88-940 FS
Nineteenth Judicial Circuit, Martin County

November 13, 1989

### APPEARANCES OF COUNSEL

**Osborne W. O'Quinn,** for husband.

**Norris Tilton,** for husband.

**Karen O. Steger,** for wife.

### OPINION OF THE COURT

JOHN E. FENNELLY, Circuit Judge.

*ORDER ON PETITIONER ALLAN TILTON'S MOTION FOR MODIFICATION*

Allan Tilton and Phyllis Tilton Shakra were married on September 6, 1983. The marriage produced two children, Allan Lee, born May 24, 1984 and Fallon Camille, born September 3, 1987. The parties divorced on February 3, 1988 with primary physical residence going to the mother. The former husband, following the events of October 1 and 2, 1988, filed a Petition for Modification on November 18, 1988. The petition alleges a substantial change in circumstance in that (1) The Mother failed to properly supervise the children, (2) The Mother

acquired a paramour who is/was dangerous to the welfare of the children, (3) The Mother has neglectfully or otherwise allowed the children to be abused or injured, (4) That the Mother, post dissolution, has undertaken a lifestyle which does not promote the best interests of the children, and (5) That the Mother has interfered with visitation since dissolution.

Factually it is apparent that the events of October 1 and 2, 1988, precipitated the petition. Those events which have now been the subject of investigation by HRS and Law Enforcement agencies. The events have also been the subject of scrutiny of physicians who are both competent and dedicated to the welfare of a society's most precious resource, its children.

Finally, this Court is now obligated to determine factually and legally the best interests of these children. Oliver Wendall Holmes, in his classic treatise *The Common Law,* observed that "The wisdom of the Law is experience." Experience in this case established that certitude in human affairs is the exception rather than the rule.

Factually on October 1, 1988, Fallon visited at her Father's home in Jensen Beach. Her Mother picked her up and detected nothing wrong with her. The child was taken home; bathed by her Maternal Grandmother and put to bed. The Grandmother further testified that the child woke up at 11:30 P.M. crying hard. The Grandmother further testified that this was unusual as the child usually slept *through* the night and was not in her words a "cry-baby." The Mother, indicated that she returned at 11:30 P.M. and the baby was awake. All the testimony indicates that at this time the lights were off and that the only illumination was provided by the television. The Mother indicated that she laid down with the baby on the couch and the baby went back to sleep. The rest of the night was uneventful according to both of of the Shakra's.

The child, according to the uncontradicted evidence, awoke with swelling and was taken to Port St. Lucie Hospital where she was initially seen by Dr. Scheel. Dr. Scheel indicated that except for the head injuries the child was normal. Dr. Scheel, who has also had experienced with battered children and is a consultant for the Child Protective Team, immediately upon seeing the child formed an opinion that the child had been battered. She also testified, however, that she did a full battery of tests and excluded any non-trauma causal factor. The doctor testified that, in her opinion, the time of injury was less than twenty-four (24) hours and most likely at the outside twelve (12) hours. Dr. Scheel's impression was head trauma, non-accidental. The

doctor thought it unlikely, although possible that the multiple bruises could be as a result of the child's head being caught.

Dr. Kadvar, Fallon's treating pediatrician, described the Mother as a conscientious and involved mother. The child when presented for previous healthy baby care was always neat, clean, and well nourished. Dr. Kadvar described the relationship between the Mother and child as affectionate. In Dr. Kadvar's opinion the injuries could be the result of a single fall, could be accidental and were consistent with the child's head being caught. It is of interest that Dr. Rifkin observed the mother and child post incident and found "Fallon in the company of her mother appeared much more relaxed and at ease" and "not inclined to separate from her mother." (Rifkin report, pg. 17).

Dr. Laguerre, a consulting pediatrician, examined Fallon at Martin Memorial. Dr. Laguerre could not rule out an unexplained accident but did find the circumstances suspicious. Dr. Laguerre did note the presence of superficial hematomas and did note that the Mother noticed blood on the crib sheet. The doctor described the Mother as concerned and desirous of another opinion possibly from Shand's. In the Court's view the medical evidence expressed in opinion form is inconclusive, as to how and when this incident occurred. Opinion evidence, medical or otherwise, is only as good as the information supporting it. That is the real crux of this case, i.e., What was not done on October 1, 1988.

A basic function of any investigation, legal or medical, seeks to answer some basic factual questions, i.e., Who, What, Where, Why, When and How. To do this, law enforcement agencies employ tried and true methods. Health and Rehabilitative Services is not a law enforcement agency. At the outset, no crime scene investigation was done. Thus the blood described by the Mother was never recovered, never photographed, or analyzed. An examination would have revealed how long it was there. This could have answered the when question.

The crib was never photographed. The Mother testified to a gap between the mattress and the rear portion of the crib. Did or could the children have fallen on the springs or caught her head, for example. This is the how question.

No interviews were conducted. Thus, the evidence of the child unexpectedly and unusually crying out was never supplied to any physician. This might indicate, possibly, when the incident occurred and, thus, could have effected Dr. Scheel's opinion as to when the incident occurred and under what circumstances.

What emerges is a number of unanswered questions most notably

who-when-how. There is no evidence to answer these critical questions. This Court must act on evidence and not conjecture. This is especially true in a situation of suspected child abuse. This Court would not hesitate to act vigorously to protect the child if the evidence established that the child was intentionally abused by anyone. Suspicion, however strong, can not take the place of evidence. The Court has also considered the character evidence and the prior care given by the Mother. What that evidence establishes is totally inconsistent with a person who would inflict or tolerate her children being abused. The Court shares and is not unmindful of the genuine concern expressed by the Father and Paternal Grandparents.

Based on the foregoing analysis the Court finds that the Father has failed to demonstrate by competent and substantial evidence that a material change, i.e., an abusive or neglectful environment now exists and that a change in primary residence would be in the best interest of the child (Zedeker v Zedeker, 444 So.2d 1034 (Fla. App., 1984)).

The Court retains jurisdiction and will not hesitate to so act if subsequent events demonstrate such a need. The Court will also require that the Mediator continue to act, when necessary, to resolve issues involving visitation.

DONE and ORDERED in Chambers, Stuart, Martin County, Florida, this 13th day of November, 1989.